UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
========================X
TRACEY WRIGHT,

      Plaintiff,

      -against-

URBAN OUTFITTERS, INC.,

      Defendant.

========================X



JUDGE HOLWELL

COMPLAINT

Docket No.:

PLAINTIFF DEMANDS A
TRIAL BY JURY

06 CV 13389

RECEIVED
NOV 21 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff TRACEY WRIGHT, by her attorneys, MORELLI RATNER PC, complaining

of the Defendant herein, upon information and belief respectfully alleges as follows:

    1.    Plaintiff **TRACEY WRIGHT** is a resident of Jersey City, in the County of

Hudson, State of New Jersey.

    2.    Plaintiff **TRACEY WRIGHT** is an African-American woman.

    3.    At all times hereinafter mentioned, Defendant **URBAN OUTFITTERS, INC.**

was and is a corporation duly organized and existing under and by virtue of the laws of the State

of Delaware, with its principal place of business in the City of Philadelphia, State of Pennsylvania.

Defendant **URBAN OUTFITTERS, INC.** employs thousands of employees.

    4.    Defendant **URBAN OUTFITTERS, INC.** is a specialty retailer and wholesaler

which offers a variety of lifestyle merchandise through three brands of clothing and fashion

merchandise: Urban Outfitters, Anthropologie and Free People. Defendant **URBAN**

**OUTFITTERS** has more than 141 stores located through the United States, Canada and

Europe, including New York. Defendant **URBAN OUTFITTERS, INC.**'s annual sales in 2005

totaled approximately $828 million.

5.      At all times hereinafter mentioned, Defendant **URBAN OUTFITTERS, INC.**'s wholesale division, Free People, was headquartered in New York, New York.  Free People is responsible for designing and marketing Defendant **URBAN OUTFITTERS, INC.**'s wholesale brands of young women's apparel.  Free People sells its products to approximately 1,100 specialty stores, department stores and catalogs, as well as through four Free People stores located in New Jersey, Pennsylvania and Virginia, and showrooms in New York City and Los Angeles.

6.      During the period from approximately June 1996 until her wrongful termination on or about August 31, 2005, Plaintiff **TRACEY WRIGHT** was employed by the Free People division of Defendant **URBAN OUTFITTERS, INC.**

7.      Throughout Plaintiff's employment with Defendant **URBAN OUTFITTERS, INC.**, commencing from approximately June 1996 until her wrongful termination on or about August 31, 2005, Richard A. Hayne, a Caucasian, was Chairman of the Board of Directors and President, a supervisor, manager and employee of Defendant **URBAN OUTFITTERS, INC.**

8.      During Plaintiff's employment at **URBAN OUTFITTERS, INC**, commencing on or before June 1996 until approximately 2001, Michael Shultz, a Caucasian, was President of Free People, a manager, supervisor and employee of Defendant **URBAN OUTFITTERS, INC.** Throughout that time, Michael Shultz was the highest-ranking supervisor of Free People, and one of Plaintiff's supervisors.  Michael Shultz was succeeded by David Frankel.

9.      During Plaintiff's employment at **URBAN OUTFITTERS, INC**, commencing in approximately 2001 through approximately 2004, David Frankel, a Caucasian, was President of Free People, a manager, supervisor and employee of Defendant **URBAN OUTFITTERS, INC.** Throughout that time, David Frankel was the highest-ranking supervisor of Free People, and one

of Plaintiff's supervisors. David Frankel was succeeded by Glen T. Senk.

10.    During Plaintiff's employment at URBAN OUTFITTERS, INC, commencing approximately January 2005 through her termination on or about August 31, 2005, Glen T. Senk, a Caucasian, was Acting President of Free People, a manager, supervisor and employee of Defendant URBAN OUTFITTERS, INC. Throughout that time, Glen T. Senk was the highest-ranking supervisor of Free People, and one of Plaintiff's supervisors.

11.    During Plaintiff's employment at URBAN OUTFITTERS, INC, commencing approximately January 2005 through her termination on or about August 31, 2005, Christopher DeWitt, a Caucasian, was Managing Director of Free People, a manager, supervisor and employee of Defendant URBAN OUTFITTERS, INC. Throughout that time, Mr. DeWitt reported directly to Acting President Glen T. Senk. Throughout that time, Christopher DeWitt was the second highest-ranking supervisor of Free People.

12.    During Plaintiff's employment with URBAN OUTFITTERS, INC, commencing approximately June 1996 until approximately January 2003, Terrie Kane, a Caucasian, was National Sales Manager for Free People, a manager, supervisor and employee of Defendant URBAN OUTFITTERS, INC. and Plaintiff's immediate supervisor. Terrie Kane reported directly to the President of Wholesale.

13.    During Plaintiff's employment with URBAN OUTFITTERS, INC, commencing approximately January 2003 through her termination on or about August 31, 2005, Kristine Meehan, a Caucasian, was National Sales Manager for Free People, a manager, supervisor and employee of Defendant URBAN OUTFITTERS, INC. Kristine Meehan succeeded Terrie Kane, and reported directly to the Managing Director. Throughout this time, Ms. Meehan was Plaintiff's immediate supervisor concerning sales sampling and showroom responsibilities. In

addition, from approximately January 2003 until approximately March 21, 2004, Kristine

Meehan was Plaintiff's immediate supervisor in Public Relations.

      14.     During Plaintiff's employment with **URBAN OUTFITTERS, INC**, commencing

approximately March 2004 through her wrongful termination on or about August 31, 2005, Meg

Hayne, a Caucasian, was Free People Creative Director, a manager, supervisor and employee of

Defendant **URBAN OUTFITTERS, INC.**, and one of Plaintiff's supervisors.  Meg Hayne is

married to Chairman of the Board Richard Hayne.

      15.     During Plaintiff's employment with **URBAN OUTFITTERS, INC**, commencing

approximately March 21, 2004 until on or about March 30, 2005, Doub Hanshaw, a Caucasian,

was Free People Image Photographer Coordinator and Public Relations Manager, a manager,

supervisor and employee of Defendant **URBAN OUTFITTERS, INC.**.  During that time, Doub

Hanshaw was Plaintiff's immediate supervisor in the Public Relations Department.  Ms. Hanshaw

reported directly to Creative Director Meg Hayne.

      16.     During Plaintiff's employment with **URBAN OUTFITTERS, INC**, commencing

approximately March 31, 2005 until her wrongful termination on or about August 31, 2005,

Carrie Yotter, a Caucasian, was Free People Public Relations Manager, a manager, supervisor and

employee of Defendant **URBAN OUTFITTERS, INC.**.  During that time, Carrie Yotter was

Plaintiff's immediate supervisor in the Public Relations Department.  Ms. Yotter reported directly

to Creative Director Meg Hayne.

      17.     During Plaintiff's employment with **URBAN OUTFITTERS, INC**, from

approximately 1998 until her wrongful termination on or about August 31, 2005, Renee

Hollinger, a Caucasian, was Human Resources Director, a manager, supervisor and employee of

Defendant **URBAN OUTFITTERS, INC.**.

18.     At all times material to this Complaint, the individual officers, directors, supervisors, managers, employees and/or agents mentioned herein, acted within the scope of their duties as officers, directors, supervisors, managers, employees and/or agents of Defendant **URBAN OUTFITTERS, INC.**

19.     Jurisdiction of the subject matter of this action is established in this Court under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000-e(f)(3).  This is the proper venue for this action under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000 et seq., in that unlawful acts alleged herein were committed within this Court's jurisdiction.

20.     On or about February 27, 2006, Plaintiff **TRACEY WRIGHT** filed a discrimination claim with the New York State Division of Human Rights and the EEOC.

21.     On or about October 20, 2006, the EEOC issued a Notice of Right to Sue on Plaintiff's behalf.


## GENERAL ALLEGATIONS OF RACE DISCRIMINATION

22.     The allegations set forth above and below are incorporated by reference as if fully set forth herein.

23.     Throughout her employment at Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** was treated differently than Caucasian employees at the company.

24.     This disparate treatment included her subjection to racial harassment, racially hostile work environment, and race discrimination, by directors, officers, supervisors, managers, employees and/or agents of Defendant **URBAN OUTFITTERS, INC.**

25.     From approximately June 1996 through her unlawful termination on or about

August 31, 2005, Plaintiff was treated by Chris DeWitt, Meg Hayne, Kristine Meehan, Renee

Hollinger and other executives, officers, supervisors, and managers, in a demeaning manner, and

was treated differently than Caucasian employees in identical and/or similar employment

circumstances.

26.     This disparate treatment included different standards of conduct, unequal pay,

unequal work assignments, unequal benefits, unequal opportunities, unequal promotion, and

unequal disciplinary measures directed toward Plaintiff and other African-American employees as

opposed to Caucasian employees similarly employed by and situated at Defendant URBAN

OUTFITTERS, INC.

27.     Within Defendant URBAN OUTFITTERS, INC. there was and continues to be

a permissive and encouraging environment for race discrimination and racial harassment among

supervisors, managers and employees of the company.


## SPECIFIC ALLEGATIONS OF RACE DISCRIMINATION

28.     Throughout Plaintiff's employment from on or about June 1996 through her

unlawful termination on or about August 31, 2005, senior level management at Defendant

URBAN OUTFITTERS, INC. was almost exclusively Caucasian.

29.     In approximately 1997, Robert Lee, an African-American also formerly employed

by Defendant URBAN OUTFITTERS, INC.'s wholesale division, filed a discrimination charge

with the Philadelphia Commission on Human Rights.  During the course of that investigation, it

was disclosed that only nine out of more than 100 corporate employees at Defendant URBAN

OUTFITTER, INC.'s Philadelphia headquarters were racial minorities: six were Black, three

were Asian.

30.     During Plaintiff **TRACEY WRIGHT**'s employment from approximately June 1996 through August 2005, only one of Defendant **URBAN OUTFITTER, INC.**'s 30 Corporate Managers was Black and, outside Philadelphia, none of its 47 Store Managers were Black.

31.     Throughout her employment at Free People's Manhattan office from approximately June 1996 through August 2005, Plaintiff **TRACEY WRIGHT** worked with approximately 10 co-workers and supervisors.  Plaintiff was Free People's only Black employee from 1999 until approximately May 2005, when a second African-American was finally hired.

32.     Commencing in approximately 1996 until approximately 1998, Plaintiff **TRACEY WRIGHT** was employed by Defendant **URBAN OUTFITTERS, INC.** in its Free People division in Manhattan as a Sales Assistant and Samples Coordinator.

33.     Commencing in approximately 1998 until approximately March 2005, Plaintiff **TRACEY WRIGHT** was employed by Defendant **URBAN OUTFITTERS, INC.** in its Free People division in Manhattan as a Samples Coordinator.

34.     Commencing in approximately 1998 until approximately March 2004, Plaintiff **TRACEY WRIGHT** also single-handedly ran Free People's Public Relations Department and was the sole employee from Defendant **URBAN OUTFITTERS, INC.** responsible for that area. Throughout that time, Plaintiff received positive performance reviews (including from her supervisor, Free People National Sales Manager Terrie Kane) and was successful in promoting Free People products.

35.     In approximately 2000, Plaintiff **TRACEY WRIGHT** was promoted by National Sales Manager Terrie Kane to Public Relations Director.  Plaintiff held that position through approximately 2002.

36.     As a result of Plaintiff's efforts and expertise in Public Relations during her employment with Defendant **URBAN OUTFITTERS, INC.**, Free People was consistently represented in monthly magazines, and its apparel was placed on MTV, VH1, Fox and other television programming, including "Desperate Housewives" and "Crossing Jordan" and in independent films. Plaintiff accomplished these feats operating with a budget a fraction of the size subsequently allotted to the Caucasian women who succeeded her.

37.     In approximately January 2003, shortly after Kristine Meehan replaced Terrie Kane as National Sales Manager, Plaintiff **TRACEY WRIGHT** was demoted, without explanation or cause, from Public Relations Director to the position of Press/Samples Coordinator. Plaintiff was demoted even though she remained the sole employee responsible for Free People's Public Relations.

38.     On or about April 1, 2003, approximately three months after her appointment as National Sales Manager, Kristine Meehan reported in writing that Plaintiff **TRACEY WRIGHT**'s overall performance was "satisfactory." Significantly, prior to April 1, 2003, Plaintiff's supervisors had consistently rated Plaintiff **TRACEY WRIGHT**'s overall performance as "very good" o r "exceptional" in her annual written performance reviews. Kristine Meehan's evaluation was made after working with Plaintiff for a brief period of approximately three months.

39.     In approximately February 2004, Plaintiff **TRACEY WRIGHT**'s title was again officially changed, from Press/Samples Coordinator to Public Relations/Sales Assistant, and she was listed in the company directory as Public Relations Assistant. When Plaintiff questioned this change, National Sales Manager Kristine Meehan maintained that Plaintiff's "title in [the] system" was "Sales Assistant." However, Plaintiff was identified in her paychecks as Public Relations Manager through 2005.

40.     In approximately March 2004, Meg Hayne was promoted to the newly created position of Free People Creative Director. The position was never posted. Although Mrs. Hayne had worked for **URBAN OUTFITTERS, INC.** since the 1980s, she had no prior experience in Public Relations. At the time, of Mrs. Hayne's promotion, Plaintiff **TRACEY WRIGHT** had single-handedly run Free People's Public Relations Department for over six years. Mrs. Hayne's promotion was effectively Plaintiff's demotion.

41.     On or about March 21, 2004, Mrs. Hayne promoted Doub Hanshaw to the position of Free People Image Photographer Coordinator and Public Relations Manager. As Public Relations Manager, Doub Hanshaw became responsible for overseeing the entire Free People Public Relations Department, and replaced Plaintiff **TRACEY WRIGHT** in reporting directly to National Sales Manager Kristine Meehan. Plaintiff never had the opportunity to apply for the Public Relations Manager position; it was never posted.

42.     In approximately March 2004, Defendant **URBAN OUTFITTERS, INC.** bypassed Plaintiff **TRACEY WRIGHT** and selected Doub Hanshaw for promotion, even though Plaintiff had significantly more seniority than Doub Hanshaw (Ms. Hanshaw was hired by **URBAN OUTFITTERS, INC.** in approximately 1999) and significantly more experience than Doub Hanshaw (Plaintiff had six years experience in Public Relations whereas Ms. Hanshaw had none.) At the time of her promotion, Ms. Hanshaw was Senior Designer for Knits. Doub Hanshaw's promotion was effectively Plaintiff's demotion.

43.     In approximately March 2004, at a meeting prior to the announcement of Doub Hanshaw's promotion to Public Relations Manager, National Sales Manager Kristine Meehan told Plaintiff that Defendant **URBAN OUTFITTERS, INC.** believed Ms. Hanshaw would bring in "better magazines, like <u>Vogue</u> and <u>Elle</u>." To the contrary, the only contact that Ms. Hanshaw

had with editors at those magazines was *after* Plaintiff **TRACEY WRIGHT** introduced Doub Hanshaw to them, *following* Doub Hanshaw's promotion.

44.     On or about March 21, 2004, Carrie Yotter, a Caucasian, was promoted to the newly-created position of Associate Image Coordinator. From approximately March 2004 to approximately March 2005, Carrie Yotter reported directly to Public Relations Manager Doub Hanshaw.

45.     Shortly after her promotion in approximately March 2004, Public Relations Manager Doub Hanshaw informed Plaintiff **TRACEY WRIGHT** that Free People Creative Director Meg Hayne told her she did not see Plaintiff "as the face of Public Relations." Mrs. Hayne further confided to Doub Hanshaw regarding Plaintiff: "I don't believe she is the image of the company."

46.     Even after she was demoted and bypassed for promotion in approximately March 2004, Plaintiff **TRACEY WRIGHT** continued to receive satisfactory performance evaluations from her supervisors, and continued to work diligently and effectively on the company's behalf.

47.     On or about March 16, 2005, Public Relations Manager Doub Hanshaw informed Plaintiff **TRACEY WRIGHT** that she was being relieved of her Samples position. In so doing, Doub Hanshaw wrote the following in Plaintiff's March 16, 2005 Performance Review:

> I am very happy to relieve you of your sampling duties so PR can be your one and only. I am excited to see you focus completely on PR because I think you are a natural at it. You have a wonderful personality which is great to have behind the Free People label. Fashion can be so snooty at times and I am glad that you have such a great sense of humor. I never want our Image to be seen as 'to cool for school' or 'she takes herself too seriously.'
>
> ... I am sorry I cannot give you more of my time but I am tremendously confident that you can independently take on our new PR goals

without any trouble.

> When I first started being the liaison between you and design/image I told you we would love to be in Nylon, Elle and Vogue and you did it!!! Thank you. And now we have a cover in this month's Jane. With such concentration on the Label I am seeing the light at the end of the tunnel.

48.    Even though Plaintiff's Public Relations duties were finally acknowledged as full-time in approximately March 2005, **TRACEY WRIGHT** remained solely responsible for sampling until approximately late July 2005.  In addition, from approximately May through June 2005, Plaintiff **TRACEY WRIGHT** spent time training her successor in samples, Hector Allemandro, Jr.  Hector Allemandro had no prior sampling experience, and was new to Free People: he previously worked in shipping & receiving for Anthropologie.

49.    On or about March 30, 2005, approximately two weeks after Plaintiff's glowing Performance Review, Carrie Yotter replaced Doub Hanshaw as Manager of the "new" Free People Public Relations Department.  Doub Hanshaw was moved to the position of "Senior Designer" responsible for Free People's new "pants concept."  At the same time, Defendant **URBAN OUTFITTERS, INC.** announced that Plaintiff **TRACEY WRIGHT** would be "focusing full time on PR reporting to Carrie."

50.    In approximately March 2005, Defendant **URBAN OUTFITTERS, INC.** once again bypassed Plaintiff **TRACEY WRIGHT** for promotion, this time selecting Carrie Yotter for the Public Relations Manager position.  This was so even though Plaintiff had approximately nine years more seniority (Ms. Yotter was hired by **URBAN OUTFITTERS, INC.** in approximately 2001) and approximately seven years more Public Relations experience than Ms. Yotter (at the time of her promotion, Ms. Yotter <u>no</u> prior Public Relations experience.)  Carrie Yotter's

promotion was effectively Plaintiff's demotion. Plaintiff never had the opportunity to apply for the Public Relations Manager position, as the opening was never posted. Instead, the position was handed to Carrie Yotter.

51.     Throughout her employment, Plaintiff **TRACEY WRIGHT** was subjected to racial harassment and disparate treatment, especially at the hands of National Sales Manager Kristine Meehan. For instance, Plaintiff and the only other racial minority employed by the Manhattan office, Wholesale Showroom Manager Olga Rincon, a Hispanic, were routinely required to perform degrading tasks for their co-workers, including rearranging office furniture, changing light fixtures, moving rolling racks, and cleaning the office. On one occasion, Plaintiff **TRACEY WRIGHT** was sent to Defendant **URBAN OUTFITTERS, INC.**'s Philadelphia headquarters for the sole purpose of making xerox copies.

52.     In approximately March 2005, Plaintiff's desk was moved to the back of the office and Plaintiff was instructed to answer the rear door whenever the bell rang. Routinely if the door bell rang and any of Plaintiff's Caucasian co-workers were standing by, Plaintiff's Caucasian co-workers would look at her and walk away rather than open the door themselves.

53.     Throughout her employment, Plaintiff **TRACEY WRIGHT** was routinely excluded from company outings, including but not limited to lunches, dinners, and company-wide meetings, that everyone else in the office (including the Receptionist) attended.

54.     In approximately 2005, after Christopher DeWitt, a Caucasian, was promoted from Urban Outfitters' Retail Division to Free People's Managing Director, he sat down with every employee in the office to introduce himself *except* for Plaintiff.

55.     During her employment from approximately January 2003 until her wrongful termination on or about August 31, 2005, National Sales Manager Kristine Meehan referred to

Plaintiff **TRACEY WRIGHT** in the office as "it" and "cow."

56.     In approximately 2003, Defendant **URBAN OUTFITTER, INC.** marketed "Ghettopoly," a knockoff of the classic "Monopoly" board game. In "Ghettopoly," "playas" acquire "stolen property" and "crack houses" with names such as "Westside Liquor," "Harlem," "The Bronx," "Smitty's XXX Peep Show," and "Tyron's Gun Shop." "Ghettopoly" included "Ghetto Stash" cards with instructions such as, "You got yo whole neighborhood addicted to crack. Collect $50 from each playa. GET CRACK," and "Hustle" cards with directions such as, "You're a little short on loot, so you decided to stick up a bank. Collect $75." The game board also depicted figures labeled "Malcum X" (*sic*) and "Martin Luthor King Jr." (*sic*.)  Plaintiff **TRACEY WRIGHT** and other African-Americans were deeply offended. Defendant **URBAN OUTFITTERS, INC.** stopped marketing the product only after public outcry from various civic and religious leaders from the Black community, including the N.A.A.C.P.

57.     During Plaintiff's employment, commencing approximately 2003, Defendant **URBAN OUTFITTERS, INC.** marketed other offensive products that perpetuated and promoted racist and religious bigotry, including:  a T-shirt bearing the inscription "New Mexico, Cleaner than Regular Mexico;" a T-shirt bearing the inscription "Everyone Loves A Jewish Girl" surrounded by dollar signs; and a "Jesus Dress Up" refrigerator magnet depicting Christ nailed to the cross bearing a placard reading, alternatively, "TGIF" or "Hang in there, Baby."

58.     In approximately August 2004, Plaintiff **TRACEY WRIGHT** informed Creative Director Meg Hayne that Ellen DeGeneres wanted to wear Free People clothing on her highly-viewed television talk show, "The Ellen Show." Meg Hayne responded less than an hour-and-a-half later: "No I am no (*sic*) interested, she is not the right image."

59.     As a consequence of Defendant **URBAN OUTFITTERS, INC.**'s racial

harassment, racially hostile work environment and race discrimination, Plaintiff **TRACEY WRIGHT** has suffered and continues to suffer severe emotional distress, including depression, anxiety, nightmares, sleep disturbance, crying jags, and upset.

60.     As a consequence of this ongoing racial discrimination, racial harassment, and racially hostile work environment, Plaintiff **TRACEY WRIGHT**'s employment was terminated on or about August 31, 2006.

61.     As a consequence of Defendant **URBAN OUTFITTERS, INC.**'s racial harassment, racially hostile work environment and race discrimination, Plaintiff has suffered and continues to suffer significant economic loss, including but not limited to loss of income and benefits, stemming from the company's adverse employment actions, including its failure to promote Plaintiff, its demotions of Plaintiff, and her wrongful termination, as set forth above and in more detail below.

62.     The allegations set forth below are incorporated by reference as if fully set forth herein.

## SPECIFIC ALLEGATIONS OF RETALIATION

63.     The allegations set forth above are incorporated by reference as if fully set forth herein.

64.     Throughout her employment at Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** received positive performance evaluations, including from her direct supervisor, Public Relations Manager Doub Hanshaw.  On numerous occasions, Plaintiff **TRACEY WRIGHT** was praised by her Supervisors for her natural aptitude in and enthusiasm for Public Relations, as well as for the excellent feedback Free People received from its media contacts concerning Plaintiff's professionalism, responsiveness and demeanor.

65.    Unfortunately, after Plaintiff **TRACEY WRIGHT** complained of racial discrimination and harassment, she was subjected to heightened scrutiny, demotion, demeaning treatment and harassment culminating in her unlawful termination, in direct retaliation for her complaints.

66.    Following Kristine Meehan's promotion to National Sales Manager in approximately January 2003, Plaintiff **TRACEY WRIGHT** repeatedly complained to management about the hostile behavior directed against her by Ms. Meehan.  Nothing was done.

67.    On or about March 28, 2004, after Plaintiff **TRACEY WRIGHT** complained about her hostile treatment, National Sales Manager Kristine Meehan again reported in writing that Plaintiff **TRACEY WRIGHT**'s overall performance was "satisfactory."  National Sales Manager Kristine Meehan lowered Plaintiff's performance ranking in direct retaliation for her complaints of hostile treatment.

68.    On or about April 2004, Plaintiff **TRACEY WRIGHT** met with National Sales Manager Kristine Meehan and Human Resources Director Renee Hollinger to discuss Plaintiff's annual performance review.  During the course of this meeting, Ms. Meehan turned to Ms. Hollinger and remarked: "I don't know how to communicate with her," referring to Plaintiff.

69.    Later in approximately April 2004, Plaintiff **TRACEY WRIGHT** contacted Human Resources Director Renee Hollinger, complained that she did not feel National Sales Manager Kristine Meehan was honest during Plaintiff's performance review, and suggested that Ms. Hollinger review correspondence from Free People's media contacts reflecting Plaintiff's good character and strong communication skills. Plaintiff **TRACEY WRIGHT** further informed Human Resources Director Renee Hollinger that if Plaintiff's communication skills had been a problem, surely that issue would have been raised sometime before during her then approximately

eight years of employment.  Rather than investigate or even attempt to redress Plaintiff's concerns, Ms. Hollinger told Plaintiff **TRACEY WRIGHT** that she should "try harder."

70.     On or about February 24, 2005, Plaintiff complained to the highest-ranking supervisor in Public Relations, Doub Hanshaw, regarding National Sales Manager Kristine Meehan's inexplicably hostile behavior toward her.  Plaintiff had made similar verbal complaints in the past, and indicated that she would complain directly to Human Resources if her complaints were ignored yet again.

71.     In approximately February 2005, Plaintiff **TRACEY WRIGHT** left a telephone message with Human Resources requesting an appointment.  Plaintiff's request was not answered.

72.     On or about March 1, 2005, Plaintiff **TRACEY WRIGHT** complained to Human Resources that she was being subjected to disparate treatment and a hostile work environment. Plaintiff complained that the unfair criticisms and demeaning assignments levied toward her by National Sales Manager Kristine Meehan had no legitimate basis and could only mean one unfortunate thing.

73.     On or about March 1, 2005, rather than redress her concerns, Human Resources Director Renee Hollinger, a Caucasian, admonished Plaintiff that "Kristine is the person she is" and "the bottom line is that she is your boss."  Human Resources Director Renee Hollinger further informed Plaintiff that she had two choices: quit her job or meet directly with her supervisor, National Sales Manager Kristine Meehan and  "ask [her] how to be part of the team." Human Resources was otherwise non-responsive.

74.     On or about March 2, 2005, in compliance with  Human Resources Director Renee Hollinger's instruction, Plaintiff **TRACEY WRIGHT** spoke directly to National Sales Manager Kristine Meehan regarding her complaints of disparate and degrading treatment.

Rather than redress Plaintiff's concerns, National Sales Manager Kristine Meehan instead harshly

chastised Plaintiff for complaining to Human Resources. Ms. Meehan then instructed Plaintiff to

limit all future communications with her to e-mail.

75.     Thereafter, from approximately March 2, 2005 until Plaintiff's unlawful

termination on or about August 31, 2005, in direct retaliation for her complaints of racial

discrimination and a hostile work environment, National Sales Manager Kristine Meehan refused

to speak to Plaintiff TRACEY WRIGHT. On one such occasion, on or about June 29, 2005, in

the presence of a Glamour Editor, National Sales Manager Kristine Meehan pointedly walked

away after Plaintiff said "good morning." The Editor was appalled.

76.     In approximately Spring 2005, Plaintiff TRACEY WRIGHT was instructed to

move to the desk in the back of the office in front of the messenger entry where she assumed

"doorman" responsibilities. At the same time, Plaintiff's computer was given to Hector

Allemandro, Jr.

77.     On or about August 31, 2005, Managing Director Christopher DeWitt and

Human Resources Director Renee Hollinger informed Plaintiff TRACEY WRIGHT that she

was being "let go." After more than nine years of dedicated service, Plaintiff TRACEY

WRIGHT was told that Defendant URBAN OUTFITTERS, INC. no longer considered her

Public Relations position necessary.

78.     On or about August 31, 2005, approximately five months after Plaintiff received a

glowing performance review from her immediate supervisor, Defendant URBAN

OUTFITTERS, INC. eliminated Plaintiff TRACEY WRIGHT's Public Relations position. At

the same time, no other Public Relations positions at Free People or within Defendant URBAN

OUTFITTERS, INC.'s other divisions (Anthropologie and Urban Outfitters) were similarly

eliminated.

79.    At the time of Plaintiff **TRACEY WRIGHT**'s termination on or about August 31, 2005, Free People was enjoying its best sales performance in approximately six years.

80.    At the time of Plaintiff's termination in August 2005, Hector Allemandro, Plaintiff's successor as Samples Coordinator, had only been with the company for approximately three months. Plaintiff **TRACEY WRIGHT** had successfully filled the position of Samples Coordinator for approximately eight years when she relinquished the position in order to continue to thrive in the Public Relations Department. Yet when Plaintiff **TRACEY WRIGHT**'s Public Relations position was "eliminated," Hector Allemandro was allowed to retain his new position as Samples Coordinator whereas Plaintiff's employment was terminated.

81.    On or about August 13, 2005, Plaintiff **TRACEY WRIGHT**'s employment was terminated in direct retaliation for her complaints concerning the ongoing and pervasive racial harassment, racially hostile work environment, race discrimination and retaliation that was directed toward her and permeated Defendant **URBAN OUTFITTERS, INC.** throughout Plaintiff's employment.

82.    On or about August 31, 2005, Plaintiff **TRACEY WRIGHT** informed Managing Director Christopher DeWitt and Human Resources Director Renee Hollinger that she believed the so-called "elimination" of her position was discriminatory. Plaintiff's complaint was ignored.

83.    As a consequence of Defendants **URBAN OUTFITTER, INC.**'s retaliatory conduct, Plaintiff **TRACEY WRIGHT** has suffered and continues to suffer severe emotional distress, including depression, anxiety, nightmares, sleep disturbance, crying jags and upset, and physical injury including gastrointestinal distress. Moreover, since her termination, Plaintiff has suffered significant economic loss, including but not limited to loss of income and benefits.

## AS AND FOR A FIRST CAUSE OF ACTION
### TITLE VII - RACE DISCRIMINATION

84.    Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 with the same force and effect as though more fully set forth at length herein.

85.    The aforesaid acts of intentional race discrimination against African-Americans by Defendant **URBAN OUTFITTERS, INC.**, its officers, directors, supervisors, managers and/or employees, violated Plaintiff **TRACEY WRIGHT**'s rights as provided under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

86.    As a consequence of Defendant's race discrimination against African-Americans while Plaintiff was an employee of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff sustained conscious pain and suffering, great mental distress, physical injury, shock and humiliation. In addition, Plaintiff incurred monetary loss as she was subjected to adverse employment actions, including disparate pay, culminating in her wrongful termination.

87.    As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and attorneys fees.

## AS AND FOR A SECOND CAUSE OF ACTION
### NYSHRL - RACE DISCRIMINATION

88.    Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation

contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

89.     The aforesaid acts of intentional race discrimination against African-Americans by Defendant **URBAN OUTFITTERS, INC.**, its officers, directors, supervisors, managers and/or employees, violated Plaintiff **TRACEY WRIGHT**'s rights as provided under New York State Human Rights Law - Executive Law Section 290 et. seq.

90.     As a consequence of Defendant's racial discrimination against African-Americans while Plaintiff was an employee of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff sustained conscious pain and suffering, physical injury, great mental distress, shock and humiliation.  In addition, Plaintiff incurred monetary loss as she was subjected to adverse employment actions, including disparate pay, culminating in her wrongful termination.

91.     As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**,  Plaintiff **TRACEY WRIGHT** has been damaged  in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A THIRD CAUSE OF ACTION
### NYCHRL - RACE DISCRIMINATION

92.     Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

93.     The aforesaid discriminatory acts by Defendant **URBAN OUTFITTERS, INC.**, its officers, directors, supervisors, managers and/or employees, perpetrated against Plaintiff **TRACEY WRIGHT** because of her African-American race violated Plaintiff **TRACEY**

WRIGHT's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"),
et. seq.

94.     As a consequence of the foregoing misconduct of Defendant **URBAN
OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** sustained conscious pain and suffering,
great mental distress, and humiliation, and incurred economic loss.

95.     As a consequence of the foregoing misconduct of Defendant **URBAN
OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has been damaged and is entitled to
compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law
Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 )
DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS,
as well as attorneys fees.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
<u>TITLE VII - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT</u>

96.     Plaintiff **TRACEY WRIGHT**  repeats and realleges each and every allegation
contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more
fully set forth at length herein.

97.     The aforesaid acts of intentional racial harassment, including the hostile work
environment for African-Americans, perpetrated by Defendant **URBAN OUTFITTERS, INC.**,
its officers, directors, supervisors, managers, and/or employees, violated Plaintiff **TRACEY
WRIGHT's** rights as provided under Title VII of the United States Civil Rights Act of 1964, as
amended, Title 42 of the United States Code, Section 2000e-2(a).

98.     As a consequence of Defendant's racial harassment and the racially hostile work
environment while Plaintiff was an employee of Defendant **URBAN OUTFITTERS, INC.**,

Plaintiff sustained conscious pain and suffering, great mental distress and humiliation.

99.     As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.,** Plaintiff **TRACEY WRIGHT** has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and attorneys fees.

### AS AND FOR A FIFTH CAUSE OF ACTION
### NYSHRL - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT

100.     Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

101.     The aforesaid acts of intentional racial harassment, including a hostile work environment for African-Americans, by Defendant **URBAN OUTFITTERS, INC.,** its officers, directors, supervisors, managers and/or employees, violated Plaintiff **TRACEY WRIGHT's** rights as provided under New York State Human Rights Law - Executive Law Section 290 et. seq.

102.     As a consequence of Defendant **URBAN OUTFITTERS, INC.'s** racial harassment and its racially hostile work environment while Plaintiff was an employee of Defendant **URBAN OUTFITTERS, INC.,** Plaintiff sustained conscious pain and suffering, physical injury, great mental distress and humiliation. In addition, Plaintiff incurred monetary loss as she was subjected to adverse employment actions, including disparate pay, culminating in her wrongful termination.

103.     As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.,** Plaintiff **TRACEY WRIGHT** has been damaged in the sum of

TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NYCHRL - RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT

104.   Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation

contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more

fully set forth at length herein.

105.   The aforesaid discriminatory acts by Defendant **URBAN OUTFITTERS, INC.**,

its officers, directors, supervisors, managers and/or employees, perpetrated against Plaintiff

**TRACEY WRIGHT** because she is African-American violated Plaintiff **TRACEY WRIGHT**'s

rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

106.   As a consequence of the foregoing misconduct of Defendant **URBAN**

**OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** sustained conscious pain and suffering,

great mental distress, and humiliation, and incurred economic loss.

107.   As a consequence of the foregoing misconduct of Defendant **URBAN**

**OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has been damaged and is entitled to

compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law

Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 )

DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS,

as well as attorneys fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### TITLE VII - RETALIATION

108.    Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

109.    The aforesaid acts of intentional retaliation by Defendant **URBAN OUTFITTERS, INC.**, its officers, directors, supervisors, managers and/or employees, violated Plaintiff **TRACEY WRIGHT**'s rights as provided under Title VII of the United States Civil Rights Act of 1964, as amended, Title 42 of the United States Code, Section 2000e-2(a).

110.    As a consequence of Defendant's retaliation against Plaintiff during her employment at Defendant **URBAN OUTFITTERS, INC.**, Plaintiff sustained conscious pain and suffering, great mental distress, and humiliation, and incurred monetary loss and various adverse employment actions, including but not limited to lack of promotion, demotion, disparate pay, degrading job assignments, and ultimately unlawful termination.

111.    As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has sustained damage in the sum of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS compensatory damages, THREE HUNDRED THOUSAND ($300,000.00) DOLLARS punitive damages, plus economic damages and attorneys fees.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### NYSHRL - RETALIATION

112.    Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more

fully set forth at length herein.

113.    The aforesaid acts of intentional retaliation against Plaintiff by Defendant URBAN OUTFITTERS, INC., its officers, directors, supervisors, managers and/or employees, violated Plaintiff TRACEY WRIGHT's rights as provided under New York State Human Rights Law - Executive Law Section 290 et. seq.

114.    As a consequence of Defendant's retaliation against Plaintiff while she was an employee of Defendant URBAN OUTFITTERS, INC., Plaintiff sustained conscious pain and suffering, great mental distress and humiliation, and incurred monetary loss, and was subjected to other adverse employment actions, including but not limited to lack of promotion, demotion, disparate pay, demeaning work assignments, and ultimately her unlawful termination.

115.    As a consequence of the foregoing misconduct of Defendant URBAN OUTFITTERS, INC.,  Plaintiff TRACEY WRIGHT has been damaged  in the sum of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS.

## AS AND FOR A NINTH CAUSE OF ACTION
## NYCHRL -RETALIATION

116.    Plaintiff TRACEY WRIGHT repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

117.    The aforesaid intentional retaliation by Defendant URBAN OUTFITTERS, INC.,  its officers, directors, supervisors, managers and/or employees, perpetrated against Plaintiff TRACEY WRIGHT because she is African-American violated Plaintiff TRACEY WRIGHT's rights as provided under New York City Human Rights Law Title 8 ("NYCHRL"), et. seq.

118.   As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**,  Plaintiff **TRACEY WRIGHT** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

119.   As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by NYC Human Rights Law Title 8, et. seq., i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

## AS AND FOR A TENTH CAUSE OF ACTION
### §1981 - RACE DISCRIMINATION

120.   Plaintiff **TRACEY WRIGHT** repeats and realleges each and every allegation contained in paragraphs 1 through 83 inclusive, with the same force and effect as though more fully set forth at length herein.

121.   Because she is African-American, Defendant **URBAN OUTFITTERS, INC.** has denied Plaintiff **TRACEY WRIGHT** the same right to make and enforce contracts as enjoyed by White citizens employed by Defendant, including rights involving the making, performance, modification, and termination of contracts with Defendant, as well as the enjoyment of all benefits, privileges, terms, and conditions of that relationship, in violation of § 1981.

122.   In the employment practices described above, Defendant **URBAN OUTFITTERS, INC.** intentionally engaged in discriminatory practices with male or with reckless indifference to the federally protected rights of Plaintiff **TRACEY WRIGHT**, entitling her to punitive damages.

123.   As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**,  Plaintiff **TRACEY WRIGHT** sustained conscious pain and suffering, great mental distress, and humiliation, and incurred economic loss.

124.   As a consequence of the foregoing misconduct of Defendant **URBAN OUTFITTERS, INC.**, Plaintiff **TRACEY WRIGHT** has been damaged and is entitled to compensatory damages and punitive damages in the sum prescribed by § 1981, i.e., compensatory damages of TWENTY-FIVE MILLION ($25,000,000.00 ) DOLLARS and punitive damages of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS, as well as attorneys fees.

WHEREFORE, Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the First Cause of Action in the amount of SIX HUNDRED THOUSAND ($600,000.00) DOLLARS; Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Second Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Third Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Fourth Cause of Action in the amount of SIX HUNDRED THOUSAND ($600,000.00); Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Fifth Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Sixth Cause of Action in the amount of FIFTY MILLION ($50,000,000.00) DOLLARS; Plaintiff **TRACEY WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Seventh Cause of Action in

the amount of SIX HUNDRED THOUSAND DOLLARS ($600,000.00); Plaintiff **TRACEY**

**WRIGHT** demands judgment against Defendant **URBAN OUTFITTERS, INC.** in the Eighth

Cause of Action in the amount of TWENTY-FIVE MILLION ($25,000,000.00) DOLLARS; and

Plaintiff **TRACEY WRIGHT** demands judgment against Defendants **URBAN OUTFITTERS,**

**INC.** in the Ninth Cause of Action in the amount of FIFTY MILLION DOLLARS

($50,000,000.00); Plaintiff **TRACEY WRIGHT** demands judgment against Defendants

**URBAN OUTFITTERS, INC.** in the Tenth Cause of Action in the amount of FIFTY

MILLION DOLLARS ($50,000,000.00); all together with the costs and disbursements of this

action, including attorneys fees, plus interest, and for any other relief which this Court deems just

and proper.

Dated:        New York, New York
              November 17, 2006

                            MORELLI RATNER PC

                            By: _____
                            MARTHA M. McBRAYER, ESQ. (MM-7097)
                            950 Third Avenue, 11th Floor
                            New York, New York 10022
                            (212) 751-9800